UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - x
                                   :
UNITED STATES OF AMERICA
                                   :        **SEALED INDICTMENT**
     -v-
                                   :        10 Cr.
LARRY SEABROOK,
                                   :
          Defendant.
                                   :
- - - - - - - - - - - - - - - - - x

**COUNT ONE**

(Receiving Corrupt Payments)

The Grand Jury charges:

**The Defendant**

1.   From in or about 2002 through and including in or about 2010, LARRY SEABROOK, the defendant, has served as a member of the New York City Council (the "Council"), representing the 12th Council District, which includes various neighborhoods in the northeast section of the Bronx, New York.  As a member of the Council, SEABROOK's official duties have included voting on legislation, representing and advocating for the interests of his constituents, and allocating New York City funds to non-profit organizations.  Since in or about January 2006, SEABROOK has also served as chair of the Council's civil rights committee.

2.   At all times relevant to this Indictment, the New York City Charter ("Charter") provided that:  "No public servant shall use or attempt to use his or her position as a public servant to obtain any financial gain, contract, license, privilege or other

private or personal advantage, direct or indirect, for the public
servant or any person or firm associated with the public
servant." The Charter further provided that: "A person or firm
'associated' with a public servant includes a spouse, domestic
partner, child, parent or sibling; a person with whom the public
servant has a business or other financial relationship; and each
firm in which the public servant has a present or potential
interest."

### The Yankee Stadium Boiler Subcontract

3.     In or about the Spring of 2006, the New York Yankees
("Yankees") were preparing to begin construction of a new stadium
located in the Bronx, New York ("New Yankee Stadium").  A
particular developer ("Developer") served as the Yankees'
representative in connection with this project, overseeing the
development and construction of the infrastructure work.  A
particular contractor ("Contractor") was hired to serve as the
general contractor for the New Yankee Stadium.

4.     In connection with the construction of the New Yankee
Stadium, in or about April 2006, the Yankees entered into a
certain community benefits agreement, pursuant to which the
Yankees agreed, among other things, to award at least 25% of the
New Yankee Stadium's construction contracts to qualified
Bronx-based businesses, at least half of which would also be
qualified minority, women-owned, and local business enterprises.

2

5.    In or about June 2006, the Contractor prepared to solicit bids for a subcontract to furnish two boilers for the New Yankee Stadium.  On or about, June 13, 2006, an employee of the Contractor ("Contractor's Employee") sent a letter to an employee of the developer ("Developer's Employee") suggesting that bids for the boiler work be solicited from a number of particular boiler manufacturers.  As of June 16, 2006, the list identified four bidders for the boiler work at the New Yankee Stadium.  The list of four bidders did not include a particular minority-owned boiler manufacturer located in the Bronx ("Bronx Boiler Manufacturer").

6.    Around this time, LARRY SEABROOK, the defendant, in his capacity as a Council Member, began to lobby the Yankees to award the boiler contract to the Bronx Boiler Manufacturer.  In particular, SEABROOK contacted one of the principal consultants retained by the Yankees to serve as a liaison between the Yankees and elected officials, community leaders, and others (the "Yankees' Representative").  SEABROOK told the Yankees' Representative that the boiler contract should be awarded to the Bronx Boiler Manufacturer, and SEABROOK personally toured the Bronx Boiler Manufacturer's facilities with the Yankees' Representative and an executive of the Bronx Boiler Manufacturer ("Bronx Boiler Executive").  The Yankees' Representative thereafter brought the Bronx Boiler Manufacturer -- and

3

SEABROOK's official support of the Bronx Boiler Manufacturer --
to the attention of the Contractor's Employee and the Developer's
Employee, both of whom were responsible for selecting: (a) the
manufacturers who would be invited to bid on the boiler
subcontract; and (b) the winning bidder (subject to approval by
the Yankees).

7.    Subsequently, on or about June 26, 2006, the Contractor
Employee sent a letter to the Developer's Employee regarding the
boiler subcontract.  The letter proposed that a bid be solicited
from the four boiler manufacturers on the list as of June 16,
2006, as well as from a fifth boiler manufacturer, namely, the
Bronx Boiler Manufacturer.  On or about July 13, 2006, the
Developer's Employee formally approved the list of five boiler
manufacturers and thereby authorized the Contractor to initiate
the bidding process for the boiler subcontract.  In or around
this time, LARRY SEABROOK, the defendant, informed the Bronx
Boiler Manufacturer that he had contacted the Yankees and that
the Bronx Boiler Manufacturer was on the list of companies from
whom a bid would be solicited for the boiler subcontract.

8.    Over the course of the summer of 2006, the Contractor
solicited bids from the selected boiler manufacturers.  The Bronx
Boiler Manufacturer submitted the second-lowest bid for the
boiler subcontract.  On or about September 18, 2006, the
Developer's Employee sent an e-mail to an executive with the

4

Yankees ("Yankees Executive") requesting authorization to award the boiler subcontract to the Bronx Boiler Manufacturer. In making this request, the Developer's Employee stated: "Please be advised there is a $13,000 premium to pay for this work because [the Bronx Boiler Manufacturer] is a Local Business Enterprise and heavily supported by a local politician. We believe this premium is minor in the scheme of things and recommend awarding this contract to [the Bronx Boiler Manufacturer]." That same day, the Yankees Executive authorized the award of the boiler subcontract to the Bronx Boiler Manufacturer.

9.     From in or about May 2007 through in or about October 2007, the Contractor paid the Bronx Boiler Manufacturer in excess of $283,000 for work performed in connection with the boiler subcontract.

### Corrupt Payments to SEABROOK

10.     Between in or about July 2006 and in or about April 2009, LARRY SEABROOK, the defendant, directly solicited a series of payments from the Bronx Boiler Executive. All the payments were made by check, either from the personal account of the Bronx Boiler Executive ("Personal Account") or corporate accounts of the Bronx Boiler Manufacturer ("Corporate Account"). On all but two occasions (in which cases the checks were typed, rather than handwritten), SEABROOK personally filled out the payee and amount sections of the checks and the Bronx Boiler Executive signed

them.  The checks were primarily issued, at SEABROOK's direction, to the North East Bronx Community Democratic Club, a political club that SEABROOK operated and controlled ("Political Club"). On one occasion, however, SEABROOK directed payment to his personal checking account, and on another occasion SEABROOK directed payment to a certain non-profit organization with which he was closely associated, namely, the Bronx African-American Chamber of Commerce ("BAACC").  See, e.g., ¶¶ 30, 86-90, 103-105, infra.  In most cases, SEABROOK personally endorsed, and in some cases even deposited, the checks he solicited from the Bronx Boiler Executive.

11.  The corrupt payments included, among others, the following checks, which totaled $50,000:

| Nature of Writing on Check | Date | From | To | Amount |
|---|---|---|---|---|
| Typed | 07/12/06 | Corporate Account | Political Club | $5,000 |
| Handwritten (by SEABROOK) | 11/16/06 | Personal Account | Political Club | $5,000 |
| Handwritten (by SEABROOK) | 07/10/07 | Personal Account | Political Club | $5,000 |
| Handwritten (by SEABROOK) | 12/05/07 | Personal Account | LARRY SEABROOK | $5,000 |
| Handwritten (by SEABROOK) | 12/19/07 | Personal Account | Political Club | $5,000 |
| Handwritten (by SEABROOK) | 03/21/08 | Personal Account | Political Club | $5,000 |

| Handwritten (by SEABROOK) | 07/02/08 | Personal Account | Political Club | $5,000 |
|---|---|---|---|---|
| Handwritten (by SEABROOK) | 09/04/08 | Personal Account | Political Club | $6,000 |
| Typed | 12/19/08 | Corporate Account | Political Club | $5,000 |
| Handwritten (by SEABROOK) | 04/21/09 | Personal | Bronx African-American Chamber of Commerce | $4,000 |

12.   Additionally, in or around the spring of 2007, LARRY SEABROOK, the defendant, personally recruited the Bronx Boiler Executive to serve as chairman of the board of BAACC.

**The Laundering of Benefits through the Political Club**

13.   As set forth above, between July 2006 and December 2008, LARRY SEABROOK, the defendant, steered $41,000 of corrupt payments to the Political Club's bank account.

14.   After routing the corrupt payments to the Political Club, LARRY SEABROOK, the defendant, took the money for his own use. Specifically, SEABROOK submitted, to a signatory on the Political Club's checking account (the "Signatory"), receipts for purported expenditures he had made in connection with Political Club business and then directed the Signatory to reimburse him for these purported expenditures either through checks to SEABROOK, personally, or to a certain credit card company to pay for, among other things, personal expenses that SEABROOK incurred

on his personal credit card bill, including airline travel to Florida, gift cards at a local department store, luggage, books, parking fines, and flowers for his sisters.

15.   In support of his claims for reimbursement for purported Political Club-related expenditures:

a.   LARRY SEABROOK, the defendant, submitted a number of receipts that had been forged or doctored.  For example, SEABROOK submitted a receipt for a bagel sandwich and diet beverage that he had purchased near City Hall.  The original cost of this purchase was approximately $7, but the receipt had been doctored so that the cost of the purchase appeared to be approximately $177.

b.   SEABROOK submitted receipts for hundreds of dollars of expenses that he had not, himself, incurred.  For example, SEABROOK submitted receipts for expenses incurred in New York at a time when he was traveling in Florida; SEABROOK submitted receipts for expenses apparently incurred by his family, including his wife; and SEABROOK submitted receipts for expenses that he could not possibly have incurred himself.  For example, SEABROOK submitted four separate receipts for gas that had been purchased at the same pump at the same gas station on the same day all within the space of approximately 45 minutes.

c.   SEABROOK sought reimbursement for over $2,700 of expenditures that had, in fact, already been reimbursed -- either

by the Council or, in some cases, by the Political Club itself.

   d. SEABROOK submitted receipts for over $7,000 in expenses incurred outside of New York State (where the Political Club was based), including over $1,800 in Florida and over $4,700 for gas he purchased in New Jersey, where he neither lived nor worked.

  16. LARRY SEABROOK, the defendant, converted the funds of the Political Club to his own use through the following payments, among others, which totaled $44,897.08:

| Date | From | To | Amount |
|------|------|------|--------|
| 07/23/06 | Political Club | Larry Seabrook | $4,047.80 |
| 07/30/06 | Political Club | Credit Card Co. (for Seabrook) | $1,342.59 |
| 11/27/06 | Political Club | Larry Seabrook | $2,627.67 |
| 12/03/06 | Political Club | Credit Card Co. (for Seabrook) | $1,362.43 |
| 12/17/06 | Political Club | Larry Seabrook | $1,417.34 |
| 12/17/06 | Political Club | Credit Card Co. (for Seabrook) | $1,384.47 |
| 07/22/07 | Political Club | Credit Card Co. (for Seabrook) | $863.88 |
| 07/22/07 | Political Club | Larry Seabrook | $3,151.16 |
| 08/18/07 | Political Club | Larry Seabrook | $1,696.75 |
| 12/29/07 | Political Club | Larry Seabrook | $4,001.34 |
| 01/28/08 | Political Club | Larry Seabrook | $1,219.26 |
| 04/11/08 | Political Club | Larry Seabrook | $3,168.34 |
| 05/18/08 | Political Club | Credit Card Co. (for Seabrook) | $3,552.15 |
| 05/18/08 | Political Club | Larry Seabrook | $1,387.24 |

| 06/22/08 | Political Club | Larry Seabrook | $1,048.77 |
| 07/20/08 | Political Club | Larry Seabrook | $931.93 |
| 08/17/08 | Political Club | Larry Seabrook | $1,000.99 |
| 09/21/08 | Political Club | Larry Seabrook | $1,757.49 |
| 11/06/08 | Political Club | Larry Seabrook | $1,788.94 |
| 12/28/08 | Political Club | Larry Seabrook | $2,291.53 |
| 01/10/09 | Political Club | Credit Card Co. (for Seabrook) | $550.00 |
| 01/11/09 | Political Club | Larry Seabrook | $1,181.40 |
| 01/22/09 | Political Club | Credit Card Co. (for Seabrook) | $2,091.07 |
| 01/31/09 | Political Club | Larry Seabrook | $1,032.54 |

## Concealment of the Illegal Payments

17.  LARRY SEABROOK, the defendant, took steps to conceal the illegal payments he received from the Bronx Boiler Executive that included the following: (a) SEABROOK directed that the illegal payments be made, in the first instance, to a third party – either the Political Club or the BAACC; and (b) SEABROOK filed financial disclosure statements with the New York City Conflicts of Interest Board that intentionally failed to disclose the illegal payments he had received.

## Statutory Violation

18.  From in or about the summer of 2006 through in or about the spring of 2009, in the Southern District of New York, LARRY SEABROOK, the defendant, during the time when he was an agent of a local government and an agency thereof, unlawfully, willfully,

10

knowingly and corruptly, solicited and demanded for the benefit
of a person, and accepted and agreed to accept, something of
value from a person, intending to be rewarded in connection with
a business, transaction, and series of transactions of such
government and agency, involving something of value of $5,000 and
more, said government and agency receiving, in a one-year period,
benefits in excess of $10,000 under a Federal program involving a
grant, contract, subsidy, loan, guarantee, insurance and other
form of Federal assistance, to wit, LARRY SEABROOK solicited,
agreed to accept, and accepted money and payments directly and
indirectly from the Bronx Boiler Executive, intending to be
rewarded for actions that SEABROOK took in his capacity as a
Council Member for the 12th Council District of the New York City
Council to assist the Bronx Boiler Executive in obtaining a sub-
contract with the New York Yankees.

(Title 18, United States Code, Sections 666(a)(1)(B) and 2.)

## COUNT TWO

### (Extortion)

The Grand Jury further charges:

19.   The allegations contained in paragraphs one through
17 are repeated and realleged as though fully set forth herein.

20.   From in or about the summer of 2006 through in or about
the spring of 2009, in the Southern District of New York, LARRY
SEABROOK, the defendant, while serving as a member of the

11

Council, unlawfully, willfully, and knowingly did commit extortion, as that term is defined in Title 18, United States Code, Section 1951(b)(2), and did thereby obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), to wit, SEABROOK obtained money from the Bronx Boiler Executive with the consent of the Bronx Boiler Executive, such consent having been induced under color of official right, in connection with SEABROOK's efforts, as a member of the Council, to help the Bronx Boiler Executive obtain a sub-contract with the New York Yankees.

(Title 18, United States Code, Sections 1951(a) and 2.)

## COUNT THREE

### (Travel And Use Of Interstate Facilities To Confer Illegal Benefit On A Public Servant)

The Grand Jury further charges:

21.  The allegations contained in paragraphs one through 17 are repeated and realleged as though fully set forth herein.

22.  From in or about the summer of 2006 through in or about the spring of 2009, in the Southern District of New York and elsewhere, LARRY SEABROOK, the defendant, unlawfully, willfully, and knowingly did travel and use and cause to be used the mail and facilities in interstate commerce with the intent to distribute the proceeds of an unlawful activity and to promote, manage, establish, carry on and facilitate the promotion,

management, establishment and carrying on of an unlawful

activity, to wit, the solicitation and acceptance of corrupt

payments in violation of N.Y. Penal Law Section 200.35, and

thereafter did perform and attempt to perform an act, and aid and

abet the performance of said act to distribute the proceeds of

said unlawful activity, and to promote, manage, establish, carry

on, and facilitate the promotion, management, establishment, and

carrying on of said unlawful activity, to wit, SEABROOK caused

the U.S. mail to be used for the payment and receipt of benefits

from the Bronx Boiler Executive for having engaged in official

conduct in connection with the boiler sub-contract with the New

York Yankees.

(Title 18, United States Code, Section 1952(a)(1) and (3), and
2.)

## COUNT FOUR

(Money Laundering)

The Grand Jury further charges:

23.   The allegations contained in paragraphs one through

17 are repeated and realleged as though fully set forth herein.

24.   From in or about the summer of 2006 through in or about

the spring of 2009, in the Southern District of New York and

elsewhere, LARRY SEABROOK, the defendant, knowing that the

property involved in certain financial transactions represented

the proceeds of some form of unlawful activity, unlawfully,

willfully, and knowingly did conduct and attempt to conduct such

13

financial transactions which in fact involved the proceeds of specified unlawful activity, to wit, the receipt of unlawful gratuities as charged in Counts One through Three, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, to wit, SEABROOK deposited and caused to be deposited into the account of the Political Club the proceeds of unlawful gratuities he solicited and received from the Bronx Boiler Executive as a reward for SEABROOK's official actions in connection with a bid for a sub-contract with the New York Yankees and then caused the Political Club to issue checks to him personally and to pay his credit card bills, in order to conceal the nature and source of the unlawful gratuities he received from the Bronx Boiler Executive.

(Title 18, United States Code, Section 1956 (a)(1)(B)(i) and 2.)

14

## COUNT FIVE

(Conspiracy to Commit Fraud in Connection With New York City
Council Discretionary Funding)

The Grand Jury further charges:

25.  The allegations contained in paragraphs one through
17 of this Indictment are repeated and realleged as though fully
set forth herein.

### Council Discretionary Funding

26.  Since at least in or about 2002 through in or
about 2009, the Council has allocated millions of dollars
annually to non-profit organizations.  These funds, which are
commonly known as "discretionary funds," are typically allocated
by the Council, in connection with specific Council initiatives.
Additionally, each Council Member is assigned a certain amount of
discretionary funds, annually, to be distributed to community-
based non-profit organizations; the Council Member identifies
non-profit organizations to which he or she would like to direct
funds, as well as the amount of the funds he or she would like
each non-profit organization to receive; assuming the Council,
including the Finance Division of the Council, does not object to
providing funds to a particular non-profit organization
identified by a Council Member, the non-profit organization
enters into a contract with an intermediary, typically a New York
City agency, which is responsible both for the actual

15

disbursement of the discretionary funds as well as oversight of the way in which the non-profit organization spends the funds. The intermediary/City agency typically does not disburse the entirety of the discretionary funds at the beginning of the contract, but rather disburses the allocated funds over the course of the given fiscal year.  Should the non-profit organization fail to abide by the terms of its contract, fail to provide adequate services, or otherwise fail to properly account for its expenditures, the intermediary/City agency can decline to disburse funds to the non-profit organization and may even terminate the contract.

### Overview of the Fraudulent Scheme

27.  Between in or about 2002 through and including in or about 2009, LARRY SEABROOK, the defendant, directed or attempted to direct at least $2.5 million of Council discretionary funds to purportedly independent non-profit organizations doing work to benefit the community.  In truth and in fact, SEABROOK controlled and directed these non-profit organizations.  Among other things, SEABROOK negotiated the leasing of office space for these organizations, created the budgets for these groups, and made personnel decisions for the groups.  Furthermore, in truth and in fact and as SEABROOK well knew, these non-profit organizations were not doing enough legitimate work to justify the funds they were receiving from the Council.

16

28.   Between in or about 2002 through and including in or about 2009, the non-profit organizations associated with LARRY SEABROOK, the defendant, paid hundreds of thousands of dollars in salary and "consulting" fees to, among others, SEABROOK's girlfriend, SEABROOK's brother, SEABROOK's sisters, and SEABROOK's nephews.

29.   Between in or about 2002 through and including in or about 2009, LARRY SEABROOK, the defendant, and others agreed to make specific material misrepresentations and material omissions to New York City (the "City") and to the Council so that SEABROOK could continue to fund the non-profit organizations and the non-profit organization could continue paying individuals close to SEABROOK.  Among other things, SEABROOK and others knowingly made false and inflated claims about the expenses that the non-profit organizations were incurring, including rent costs, so that the City would continue disbursing funds to the organizations, some of which funds were then used to pay SEABROOK's girlfriend, brother, sisters, and nephews.

### Non-Profit Organizations Associated With SEABROOK

30.   At all times relevant to this Indictment, LARRY SEABROOK, the defendant, directly associated himself with a number of non-profit organizations (collectively, the "Seabrook-Related Non-Profits"), including the North East Bronx Redevelopment Corporation ("NEBRC"); the Bronx African-American

Chamber of Commerce ("BAACC"); the New York African-American
Legal & Civic Hall of Fame, Inc., and the African-American Civic
& Legal Hall of Fame Inc. Leon Eastmond Educational Excellence
Program (collectively, the "Hall of Fame"); and Mercy Foundation
of NY, Inc. (the "Mercy Foundation").  SEABROOK was also closely
associated with another non-profit organization called the
African-American Bronx Unity Day Parade, Inc. (the "Unity Day
Parade").

     a.   NEBRC: At all times relevant to this Indictment,
NEBRC was a non-profit organization incorporated in 1990.  NEBRC
has described its mission to include, among other things, the
production of "life long learners who are self-directed,
empowered, and committed to excellence."  In its literature,
NEBRC purports to have offered a range of programs and services
relating to education and vocational training, among other
things.

     b.   BAACC:  At all times relevant to this Indictment,
BAACC was a non-profit organization incorporated in 2007.  BAACC
has described its mission to include, among other things, the
promotion of business opportunities for African-Americans and the
expansion of opportunities for minority and African-American
businesses in the Bronx and elsewhere in the City.  At the time
of its incorporation, the BAACC had a Board of Directors that
included, among others, the wife of LARRY SEABROOK, the defendant

("Seabrook's Wife") and the executive of a Bronx boiler manufacturer (the "Bronx Boiler Executive").

      c.   <u>Hall of Fame</u>: At all times relevant to this Indictment, SEABROOK was associated with two related organizations known as the "Hall of Fame":  the African-American Civic & Legal Hall of Fame Inc. Leon Eastmond Educational Excellence Program and the New York African-American Legal & Civic Hall of Fame, Inc. (collectively, the "Hall of Fame").  At all times relevant to this Indictment, the African-American Civic & Legal Hall of Fame Inc. Leon Eastmond Educational Excellence Program was a non-profit organization incorporated in 2002, with papers filed by SEABROOK.  This Hall of Fame has described its mission to include providing cultural awareness programs and tutorial programs for youth in the Bronx.  At the time of its incorporation, the Hall of Fame had a Board of Directors that included SEABROOK's Wife; an individual who served at various times, among other things, as the Executive Director of NEBRC (Seabrook Associate # 2"); and an individual who served as the chairman of NEBRC's Board of Directors ("Seabrook Associate # 3").  At all times relevant to this Indictment, the New York African-American Legal & Civic Hall of Fame, Inc. was a non-profit organization incorporated in 1998.  At various times, Seabrook Associate # 3 served as the chairman of its Board of Directors and Seabrook Associate # 2 served as the executive

19

director.

     d.   <u>The Mercy Foundation</u>: At all times relevant to this Indictment, the Mercy Foundation was a non-profit organization incorporated in 2002.  The Mercy Foundation has described its mission as providing support services for single parents, children, and families in the Bronx.  The Mercy Foundation was created by and, at all times relevant to the Indictment, operated by, among others, Seabrook Associate # 1.

     e.   <u>Unity Day Parade</u>: At all times relevant to this Indictment, the Unity Day Parade was a non-profit organization incorporated in 1999.  The Unity Day Parade has described its mission to include, among other things, the operation of an annual parade in the Bronx and the promotion of cultural awareness and civic pride.  At the time of its incorporation, the Unity Day Parade had a Board of Directors that included, among others, LARRY SEABROOK, the defendant, and an individual who served, among other things, as a board member of the Hall of Fame ("Seabrook Associate # 4").

    31.  At all times relevant to the Indictment, the Seabrook-Related Non-Profits have been funded exclusively by funds allocated, in the first instance, by the Council, primarily at the direction of LARRY SEABROOK, the defendant.  Between in or about 2002 through and including in or about 2009, SEABROOK directed or attempted to direct at least $2.5 million to the

Seabrook-Related Non-Profits.   Specifically, SEABROOK directed or attempted to direct at least $1,019,714 to NEBRC; $925,458 to BAACC; $421,892 to the Hall of Fame; and $175,000 to the Mercy Foundation.   Of these funds, a total of approximately $1.2 million were actually disbursed to the above-named non-profit organizations.   These same non-profit organizations also received additional funds from the Council, usually at the request of the Bronx delegation of the Council, of which SEABROOK was a member.

32.   The Seabrook-Related Non-Profits have shared office space with one another; they have frequently operated out of the same building in which LARRY SEABROOK, the defendant, has maintained a district office; and they have been controlled and operated by a number of the same individuals, including SEABROOK and a woman who was SEABROOK's girlfriend ("Seabrook Associate # 1").   Furthermore, at all times relevant to the Indictment, the Seabrook-Related Non-Profits have sublet their office space from the Unity Day Parade.

**SEABROOK Associates at the Seabrook-Related Non-Profits**

33.   A number of individuals closely associated with LARRY SEABROOK, the defendant, have assumed duties and responsibilities at two or more of the Seabrook-Related Non-Profits, including the Unity Day Parade.   These individuals include:

a.   <u>Seabrook Associate # 1</u>: Seabrook Associate # 1 served, at various times, as Executive Director of and/or

consultant for NEBRC; Executive Director of and/or consultant for the Hall of Fame; Executive Director of the Mercy Foundation; a consultant for the Unity Day Parade; and a signatory on at least one checking account used by NEBRC.  Seabrook Associate # 1 also worked, on a part-time basis, for Seabrook's Council office.

      b.   <u>Seabrook Associate # 2</u>: Seabrook Associate # 2 served, at various times, as Executive Director of NEBRC; Executive Director of the Hall of Fame; treasurer of the Mercy Foundation; a signatory on at least one checking account used by NEBRC; and a signatory on at least one checking account used by the Hall of Fame.

      c.   <u>Seabrook Associate # 3</u>: Seabrook Associate # 3 served, at various times, as chairman of the Board of Directors of NEBRC; chairman of the Board of Directors of the Hall of Fame; president of the BAACC; a signatory on at least one checking account used by NEBRC; and a signatory on at least one checking account used by the Hall of Fame.

      d.   <u>Seabrook Associate # 4</u>: Seabrook Associate # 4 served, at various times, as a member of the Board of Directors of NEBRC; a member of the Board of Directors of the Hall of Fame; a member of the Board of Directors of the Unity Day Parade; and a signatory on at least one checking account used by the Unity Day Parade.  Additionally, Seabrook Associate # 4 was a signatory on at least one checking account used by the North East Bronx

22

Community Democratic Club ("Political Club"), a political club that SEABROOK operated and controlled, and is in fact the Signatory referred to in Counts One through Four of this Indictment.

       e.    <u>Seabrook Associate # 5</u>: Seabrook Associate # 5 served, at various times, as an administrative assistant for NEBRC; an administrative assistant for the Mercy Foundation; bookkeeper for the Hall of Fame; and fiscal coordinator for BAACC.

       f.    <u>Seabrook Associate # 6</u>: Seabrook Associate # 6 served, at various times, as a member of the Board of Directors of the Unity Day Parade; a signatory on at least one checking account used by the Unity Day Parade; and a signatory on at least one checking account used by the Political Club.

       g.    <u>Seabrook Associate # 7</u>: Seabrook Associate # 7 served, at various times, as secretary of the Board of Directors of NEBRC; secretary of the Board of Directors of the Hall of Fame; and vice chairman of the Board of Directors of BAACC.

       h.    <u>Seabrook Associate # 8</u>: Seabrook Associate # 8 served, at various times, as a member of the Board of Directors of NEBRC; a member of the Board of Directors of the Hall of Fame; secretary of the BAACC; and a signatory on at least one checking account used by NEBRC.

       i.    <u>Seabrook Associate # 9</u>: Seabrook Associate # 9

served, at various times, as Executive Director of the BAACC; a consultant for the Hall of Fame; a signatory on at least one checking account of BAACC; and Assistant Executive Director of the Mercy Foundation.

**Payments to Seabrook Associates and Others Close to SEABROOK**

34.  Of the funds that the Seabrook-Related Non-Profits received from the Council -- either directly (in the form of discretionary funding) or indirectly (as described in paragraphs 57, 82 and 83 below) -- approximately $530,000 was disbursed to (a) the girlfriend of LARRY SEABROOK, the defendant; (b) SEABROOK's brother; (c) two of SEABROOK's sisters; and (d) one of SEABROOK's nephews.  The Unity Day Parade paid SEABROOK's girlfriend and SEABROOK's brother an additional $26,100.  The funds were disbursed as follows:

a.   Seabrook Associate # 1:  Between 2002 and 2009, Seabrook Associate # 1, Seabrook's girlfriend, was paid approximately $322,800 from NEBRC, the Hall of Fame, and/or the Mercy Foundation, for work as either Executive Director or consultant.  Additionally, Seabrook Associate #1 was paid an additional approximately $8,300 for consulting work for the Unity Day Parade.  Finally, between 2004 and 2009, Seabrook Associate # 1 was paid an additional approximately $41,000 for performing work for SEABROOK's Council office, such as preparing newsletters and coordinating special events.

b.   <u>Seabrook's Brother</u>:  Between 2002 and 2009,
SEABROOK's brother ("Seabrook's Brother") was paid approximately
$70,000 by NEBRC for work as program director and approximately
$2,500 by the Hall of Fame for work as a consultant.  SEABROOK's
Brother was paid an additional $17,300 from the Unity Day Parade.

c.   <u>Seabrook Sister # 1</u>:  Between 2002 and 2009, one
of SEABROOK's sisters ("Seabrook Sister # 1") was paid
approximately $66,500 by NEBRC, the Hall of Fame, and/or the
Mercy Foundation.  The funds either went to Seabrook Sister #1
directly or through a company she owned and controlled.  At all
times relevant to the Indictment, Seabrook Sister # 1 lived in
Georgia.

d.   <u>Seabrook's Nephew</u>:  Between 2002 and 2009, for
work as a consultant or employee, one of SEABROOK's nephews
("Seabrook Nephew") was paid at least approximately $59,000 from
NEBRC, the Hall of Fame, and/or the Mercy Foundation.
Additionally, Seabrook's Nephew was paid an additional
approximately $500 from the Unity Day Parade.  Finally,
Seabrook's Nephew was paid an additional approximately $28,000
for "office assistance" in SEABROOK's Council office.

e.   <u>Seabrook Sister # 2</u>:  Between 2002 and 2006,
another of SEABROOK's sisters ("Seabrook Sister # 2") was paid
approximately $9,200 by the Hall of Fame and/or the Mercy
Foundation for consulting work and for furnishing copies of a

book she wrote. The funds either went to Seabrook Sister # 2 directly or through a company she owned or controlled. At all times relevant to the Indictment, Seabrook Sister # 2 lived in Florida.

35. NEBRC, the Hall of Fame, and/or the Mercy Foundation also paid thousands of dollars to other individuals with ties to SEABROOK, including another of SEABROOK's nephews, who was paid approximately $3,350 (and an additional approximately $6,500 for work in SEABROOK's Council office); the son of Seabrook Associate #1, who was paid approximately $6,250 (and an additional approximately $18,200 for work in SEABROOK's Council office); Seabrook Associate # 2, who was paid approximately $136,400; and the former spouse of Seabrook Associate # 2, who was paid approximately $28,600.

### Means and Methods of the Conspiracy

36. In making discretionary fund allocations to the Seabrook-Related Non-Profits, LARRY SEABROOK, the defendant, made a number of material omissions to the Council and/or other City agencies through which discretionary funds were allocated to the Seabrook-Related Non-Profits. These material omissions included the following: (a) SEABROOK failed to disclose to the Council and/or other City officials the material fact that NEBRC, BAACC, the Hall of Fame, and the Mercy Foundation were associated with him; and (b) SEABROOK failed to disclose that discretionary funds

allocated to the Seabrook-Related Non-Profits would benefit individuals close to him, including, among others, his girlfriend, his siblings and his nephew.

37.   Once LARRY SEABROOK, the defendant, had allocated and/or otherwise directed Council discretionary funds to the Seabrook-related non-profits, SEABROOK and others agreed to make specific material misstatements and misrepresentations to the City agencies with which NEBRC, the Hall of Fame and the Mercy Foundation had contracts to receive discretionary funds.   Among other things, SEABROOK and others made false and inflated claims about the expenses that the Seabrook-Related Non-Profits were incurring, so that it would appear that these non-profits were doing more work than they were, in fact, doing, and so that the City would continue disbursing funds to the Seabrook-Related Non-Profits.

### The Inflated Rent Scheme

38.   One component of the scheme to defraud New York City in connection with discretionary funding involved material misrepresentations that LARRY SEABROOK, the defendant, and his unindicted co-conspirators made about the costs of renting office space for NEBRC, the Hall of Fame, and the Mercy Foundation.

39.   From in or about the summer of 2004 up to and including in or about the summer of 2007, NEBRC, the Hall of Fame, and the Mercy Foundation purported to conduct their

27

business at a series of locations: from in or about the summer of 2004 up to and including in or about the summer of 2005, these non-profit organizations purported to operate at 3763-3765 White Plains Road in the Bronx ("Location # 1"); from in or about the summer of 2005 up to and including in or about the summer of 2006, these non-profit organizations purported to operate at 3687 White Plains Road in the Bronx ("Location # 2"); and from in or about the summer of 2006 up to and including at least in or about the summer of 2007, these non-profit organizations purported to operate at, among other places, 1530 East 222nd Street in the Bronx ("Location # 3").

     40.  Rather than leasing their space directly from the actual landlords at Locations # 1, # 2, and # 3, NEBRC, the Hall of Fame, and the Mercy Foundation entered into fictitious "sub-leases" with the Unity Day Parade, which in turn leased the space directly from the actual landlords for each of the respective locations.  Each year, the three non-profit organizations collectively agreed to pay the Unity Day Parade an amount that was substantially greater than the rent that the Unity Day Parade paid the actual landlord.  Notably, in creating the fictitious sub-leases with the Unity Day Parade, Seabrook Associate # 1 or Seabrook Associate # 5 forged the signature of the purported representative of the Unity Day Parade, namely, Seabrook Associate # 6.

41.   Numerous times between in or about the summer of
2004 and in or about the summer of 2007, LARRY SEABROOK, the
defendant, himself created the budgets for the contracts that
NEBRC, the Hall of Fame, and the Mercy Foundation entered into
with City agencies in order to receive the discretionary funds
that SEABROOK had directed to them.   These budgets included
itemized expenses, such as rent costs.   When SEABROOK created the
budgets for the contracts for the non-profit organizations --
budgets that his unindicted co-conspirators later submitted to
the City agencies -- SEABROOK grossly inflated the legitimate
rent costs by indicating the amount of rent each non-profit
organization owed the Unity Day Parade, rather than the money
that was due to be paid to the real landlord.

42.   For the period of time between the summer of 2004
and the summer of 2005, NEBRC and the Hall of Fame billed the
City for a total of approximately $26,400 in rent for Location #
1 and paid the Unity Day Parade a total of approximately $26,400.
For a number of months during that period of time, however, NEBRC
and the Hall of Fame actually were operating out of Location # 2,
not Location # 1.   Additionally, while the Unity Day Parade
disbursed only approximately $6,000 for rental costs during that
time period, the Unity Day Parade paid this money to the landlord
for Location # 2; the organization did not pay any money to the
landlord for Location # 1.   In so doing, NEBRC and the Hall of

Fame defrauded the City of at least approximately $20,400.

43. For the period of time between the summer of 2005 and the summer of 2006, NEBRC and the Hall of Fame billed the City for a total of approximately $72,000 in rent for Location # 2 and paid the Unity Day Parade a total of approximately $54,400. In truth and in fact, however, the Unity Day Parade actually paid the landlord for Location # 2 only approximately $18,000 for renting Location # 2 during that time period. In so doing, NEBRC and the Hall of Fame defrauded the City of approximately $54,000.

44. For the period of time between the summer of 2006 and the summer of 2007, NEBRC and the Mercy Foundation billed the City, directly or indirectly, for a total of approximately $78,000 in rent for Location # 3 and paid the Unity Day Parade a total of approximately $81,000. In truth and in fact, however, the Unity Day Parade actually paid the landlord for Location # 3 only approximately $49,500. In so doing, NEBRC and the Mercy Foundation defrauded the City of approximately $28,500.

45. Accordingly, in connection with the inflated rent scheme alone, LARRY SEABROOK, his unindicted co-conspirators, and the non-profit organizations defrauded the City of approximately $102,900.

## Other Inflated Expenses

46. Between in or about 2002 and in or about 2006, NEBRC and the Hall of Fame also made material misrepresentations

to the City about non-rent expenses they had purportedly incurred.  NEBRC and the Hall of Fame made these representations to the City agencies administering the non-profit organizations' contracts to receive discretionary funds, and NEBRC and the Hall of Fame did so in order to insure that the City agencies administering their contracts would, in fact, continue to disburse the discretionary funds.

47.  Between in or about 2002 and in or about 2006, NEBRC and the Hall of Fame requested reimbursement from the City in connection with expenses for which reimbursement had already been made.  The City then disbursed approximately $41,450 to NEBRC and the Hall of Fame for expenses that had already been reimbursed. NEBRC also sought and received reimbursement for an additional approximately $2,700 in expenses for which reimbursement had already been made but which do not appear even to have been incurred by NEBRC in the first place.  Finally, during this time period, NEBRC and the Hall of Fame requested and received reimbursement for at least approximately $66,650 in additional expenses that likewise do not appear even to have been incurred by the non-profit organizations in the first place.

48.  By making duplicate requests for reimbursement and by requesting reimbursement for fictitious expenses, NEBRC and the Hall of Fame defrauded the City of at least an additional approximately $110,800.

## Statutory Allegation

49.  From in or about 2002 up to and including in or
about 2009, in the Southern District of New York and elsewhere,
LARRY SEABROOK, the defendant, together with others known and
unknown, unlawfully, willfully, and knowingly did combine,
conspire, confederate and agree together and with each other to
commit offenses under Chapter 63, Title 18, United States Code,
to wit, mail fraud and wire fraud, in violation of Title 18,
United States Code, Sections 1341 and 1343.

## Objects of the Conspiracy

50.  It was a part and the objects of the conspiracy that
LARRY SEABROOK, the defendant, together with others known and
unknown, having devised and intending to devise a scheme and
artifice to defraud the City in connection with discretionary
funding for the Seabrook-Related Non-Profits, and for obtaining
such money by means of false and fraudulent pretenses,
representations and promises, for the purpose of executing such
scheme and artifice and attempting to do so, would and did (1)
transmit and cause to be transmitted by means of wire and radio
communications in interstate and foreign commerce, writings,
signs, signals, pictures, and sounds, to wit, interstate
telephone calls, interstate faxes, and interstate wire transfers
of funds, in violation of Title 18, United States Code, Section
1343, and (2) cause matters and things to be delivered by mail

32

and private interstate carrier according to the directions

thereon, to wit, correspondence, invoices, and letters regarding

contracts, in violation of Title 18, United States Code, Section

1341.

(Title 18, United States Code, Section 1349.)

### COUNT SIX

(Mail Fraud in Connection With New York City Council
Discretionary Funding)

The Grand Jury further charges:

51.   The allegations contained in paragraphs one through

17 and paragraphs 26 through 48 of this Indictment are repeated

and realleged as though fully set forth herein.

52.   From in or about 2002 up to and including in or

about 2009, in the Southern District of New York and elsewhere,

LARRY SEABROOK, the defendant, having devised and intending to

devise a scheme and artifice to defraud, and for obtaining money

and property by means of false and fraudulent pretenses,

representations, and promises, would and did, for the purpose of

executing such scheme and artifice and attempting to do so, cause

mail matter to be sent and delivered by the United States Postal

Service, and to deposit and to cause to be deposited matters and

things to be sent and delivered by private and commercial

interstate carriers, and to take and to receive therefrom,

matters and things, and knowingly to cause such matters and

things to be delivered by mail and such carriers according to the

direction thereon, and at the place at which it was directed to be delivered by the person to whom it was addressed, such matters and things, to wit, SEABROOK engaged in a scheme to defraud the City in connection with discretionary funding for the Seabrook-Related Non-Profits, and in furtherance of that scheme, he caused to be mailed correspondence, invoices, and letters regarding contracts that NEBRC, the Hall of Fame and the Mercy Foundation entered into with City agencies.

(Title 18, United States Code, Sections 1341 and 2.)

## COUNT SEVEN

(Wire Fraud in Connection With New York City Council
Discretionary Funding)

The Grand Jury further charges:

53. The allegations contained in paragraphs one through 17 and paragraphs 26 through 48 of this Indictment are repeated and realleged as though fully set forth herein.

54. From in or about 2002 up to and including in or about 2009, in the Southern District of New York and elsewhere, LARRY SEABROOK, the defendant, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money by means of false and fraudulent pretenses, representations and promises, unlawfully, willfully, and knowingly, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and

34

artifice, to wit, SEABROOK engaged in a scheme to defraud the
City in connection with discretionary funding for the Seabrook-
Related Non-Profits, and in furtherance of that scheme, he
transmitted and caused to be transmitted interstate telephone
calls, interstate faxes, and interstate wire transfers of funds.

(Title 18, United States Code, Sections 1343 and 2.)

### COUNT EIGHT

(Conspiracy to Commit Fraud in Connection with the Council's FDNY
Fire Diversity/Recruitment Initiative)

The Grand Jury further charges:

55.   The allegations contained in paragraphs one through
17 and paragraphs 26 through 48 of this Indictment are repeated
and realleged as though fully set forth herein.

### Overview of the Fraudulent Scheme

56.   In or about 2006, a certain City agency ("City Agency #
1") audited NEBRC in connection with certain contracts NEBRC had
to receive discretionary funding allocated by LARRY SEABROOK, the
defendant.   Among other things, City Agency # 1 identified
widespread financial mismanagement and accounting improprieties
at NEBRC, and discovered that NEBRC fell radically short of the
performance goals set by those contracts.   A representative of
City Agency # 1 discussed these problems directly with SEABROOK.

57.   Notwithstanding his knowledge of NEBRC's problems,
LARRY SEABROOK, the defendant, recommended that NEBRC receive
approximately $300,000 of funds that the Council had allocated to

increase diversity in the ranks of the New York City Fire Department ("FDNY"). SEABROOK also recommended that a certain college in Manhattan (the "College") receive $450,000 in other funding relating to this initiative (the "Fire Diversity/Recruitment Initiative" or the "Initiative"), and he did so at a time when he was paid to serve as an adjunct professor at the College. The Council ultimately allocated $750,000 to the College and directed the College to subcontract with NEBRC in the amount of $300,000.

58. LARRY SEABROOK, the defendant, and others agreed to make specific material misrepresentations and material omissions to the Council and to the College so that NEBRC could receive $300,000 in connection with the Fire Diversity/Recruitment Initiative. In recommending NEBRC, SEABROOK materially misrepresented that NEBRC would successfully and effectively use the funds to advance the goals of the Initiative. Furthermore, SEABROOK failed to disclose material facts including: (a) the fact that City Agency # 1 had recently audited NEBRC and identified serious problems with NEBRC's financial accounting as well as with its performance under the contract; and (b) the fact that the funds allocated to NEBRC would benefit individuals close to SEABROOK, including, among others, his girlfriend, his sister and his nephew.

36

59.   Although NEBRC had represented to both the Council and
the College that it would use the $300,000 in funds both to
recruit individuals to take the FDNY firefighter examination and
to mentor those individuals in connection with the examination,
including with physical conditioning training, in truth and in
fact, NEBRC itself ultimately provided neither mentorship nor
physical conditioning training.   Furthermore, NEBRC used some of
the funds it received to pay, among others, Seabrook Associate #
1, Seabrook Sister # 1, and Seabrook's Nephew.

### City Agency #1's Audit of NEBRC

60.   In or about 2006, City Agency # 1 -- an agency that
had, in the past, entered into contracts with NEBRC and which was
at the time overseeing a current contract with NEBRC -- conducted
a rigorous audit of NEBRC's expenses during a prior year at the
same time that program administrators at City Agency # 1
identified serious problems with NEBRC's performance in
connection with a contract worth approximately $355,000 for the
current fiscal year.

61.   In the spring and summer of 2006, representatives of
City Agency # 1 had a number of meetings and/or conversations
about NEBRC with, among others, LARRY SEABROOK, the defendant, a
high-ranking member of SEABROOK's Council office, Seabrook
Associate # 1, and Seabrook Associate # 2.   During these meetings
and/or conversations, representatives of City Agency # 1

expressed serious concern about NEBRC's financial management and
its ability to meet the goals of the contract.  During these
meetings and/or conversations, representatives of City Agency # 1
also indicated that City Agency # 1 intended to rate NEBRC
"unsatisfactory," in which case, the rating would be included in
the City's vendor database and would affect NEBRC's ability to
continue doing work with the City.

   62.  City Agency # 1 identified the following deficiencies,
among others, in NEBRC's performance in connection with its
contract for workforce development and business district
development during the 2005-2006 fiscal year:

   a.   Despite NEBRC's written assurances that it could
begin activity prior to approval of its contract, full services
were not in place until the ninth month of the contract.

   b.   The contract funded a position for a full-time job
developer and stipulated an overall goal that NEBRC directly
place 42 individuals in jobs.  However, NEBRC reported only three
such direct job placements, representing a placement rate of 7%
-- and all three of these job placements were with SEABROOK's
Council office.  Additionally, although City Agency # 1 was
apparently unaware of this at the time, the individual NEBRC
hired to serve as its full-time job developer was Seabrook Sister
# 1.

   c.   Only eight out of 46 participants completed 80% of

38

the computer literacy training which NEBRC was contractually
obligated to provide, and none of these participants ended up
getting the relevant credentials.

      d.   The contract stipulated that, during the 2005-2006
fiscal year, 49 individuals be placed in, and remain in, an
unsubsidized job 90 days after their initial employment.  Within
the contractual period, NEBRC, in fact, placed no individuals who
remained in an unsubsidized job 90 days after their initial
placement.

      e.   Although NEBRC was supposed to advertise for a
number of occupational training programs, NEBRC, in fact, was
almost exclusively advertising and promoting a certain commercial
driving school in the Bronx.  Furthermore, NEBRC continued to
promote that commercial driving school even after it had become
clear that the school could not accommodate any more students.

      f.   NEBRC filed late and inaccurate financial reports,
commingled funds, and generally had, according to a report
prepared by City Agency # 1, "seriously inadequate financial
recordkeeping and accounting."

63.  In or about the early fall of 2006, the Agency asked
the New York City Department of Investigation ("DOI") to begin an
investigation of NEBRC.  In or about October 2006, a
representative of a different City agency directly informed LARRY
SEABROOK, the defendant, that NEBRC was under investigation and

that DOI had instructed that City agency not to move forward with any contracts with NEBRC.

### The Fire/Diversity Recruitment Initiative

64.  In an effort to increase diversity in the ranks of the New York City Fire Department, the Council, in or about the summer of 2005, allocated approximately $1.5 million to, among other things, recruit and train women and minorities to take and pass the firefighter examination and thereafter become City firefighters.  Certain of those funds were not, however, disbursed between the summer of 2005 and the summer of 2006 and were instead "rolled over" to the following fiscal year.  In the interim, between in or about 2005 and in or about 2006, the Council sought to identify colleges and/or other organizations that could successfully implement the Fire Diversity/Recruitment Initiative and effectively utilize the funds allocated by the Council in connection with that Initiative.

### Means and Methods of the Conspiracy

65.  At least in or about the summer of 2006, LARRY SEABROOK, the defendant, recommended that NEBRC receive a portion of the funds allocated by the Council in connection with the Fire Diversity/Recruitment Initiative, because, according to SEABROOK, NEBRC was prepared to successfully implement the Initiative.  SEABROOK also recommended that the College receive a portion of the funds allocated by the Council.  At the time,

40

SEABROOK was paid to serve as an adjunct professor at the College. Furthermore, Seabrook Associate # 3, an individual who served at various times as chairman of the Board of Directors of NEBRC, had previously been a high-ranking official at the College.

66. In recommending that the Council allocate funds to NEBRC in connection with the Fire Diversity/Recruitment Initiative, SEABROOK materially misrepresented that NEBRC would be able to successfully and effectively use the funds to further the goals of the Initiative. Furthermore, SEABROOK and others failed to disclose to the Council the following material facts, among others, which he knew to be true:

a. City Agency # 1 had recently audited NEBRC and identified serious problems with NEBRC's financial accounting as well as with its performance under the contract;

b. SEABROOK and others at NEBRC had engaged in a years-long scheme to commit fraud in connection with discretionary funding (as described in Counts Five through Seven of this Indictment); and

c. The funds allocated to NEBRC would benefit individuals close to SEABROOK, including, among others, his girlfriend, his sister and his nephew.

67. Furthermore, at no time prior to the ultimate disbursement of Initiative funds to NEBRC did SEABROOK or any

41

other representative of NEBRC inform the Council or the College
that NEBRC was under investigation by DOI.

68.  In or about the summer or early fall of 2006, Seabrook
Associate # 1 submitted, to the Council and/or the College, a
proposal describing what NEBRC could do to assist in the Fire
Diversity/Recruitment Initiative.  In the proposal, NEBRC
described itself as providing "a broad range of intergenerational
services to the community," including "training programs (e.g.,
job readiness, computer, and specialized occupational training)."
NEBRC proposed to implement a city-wide recruitment campaign and
also proposed to provide "educational services" to prospective
firefighters, including "educational needs assessment,"
"instructional and tutorial services," and "physical
conditioning" training.

69.  In the proposal that Seabrook Associate # 1 submitted
to the Council and/or the College, NEBRC also included a proposed
budget of $318,000, which listed itemized expenses for, among
other things, an Executive Director ($25,000), a program
coordinator ($35,000), a physical conditioning trainer ($10,000),
consultants who would provide training ($25,000), and printing
($5,000).

70.  On or about September 20, 2006, the Council directed
that $750,000 of the "rolled over" funds be allocated to the
College, and the Council further directed the College to

subcontract $300,000 of those funds to NEBRC in connection with
the Fire Diversity/Recruitment Initiative.  NEBRC ultimately
received the funds in one check dated November 10, 2006, in the
amount of $84,288, and one check dated January 22, 2007, in the
amount of $215,712.

71.  On or about September 27, 2006, LARRY SEABROOK, the
defendant, and another representative of NEBRC attended a meeting
with a high-ranking officer of the College to discuss the Fire
Diversity/Recruitment Initiative.  Among other things, SEABROOK
"vouched" for NEBRC at this meeting, stating and/or otherwise
implying that NEBRC was a good and effective community
organization.

72.  Although NEBRC ultimately did engage in some
recruitment activity in connection with the Initiative -- by, for
example, placing advertisements in newspapers and distributing
promotional flyers -- NEBRC did not provide any of the mentoring,
training, or physical conditioning it had represented that it
would provide.  Mentoring and training sessions did take place in
the Bronx on seven occasions between November 2006 and January
2007, but that mentoring and training was, in fact, provided
solely by individuals associated with an organization of African-
American firefighters ("Firefighter Society").  The individuals
from the Firefighter Society who provided that mentoring and
training were volunteers who were not compensated for their time

43

by NEBRC or otherwise.   Furthermore, to the extent NEBRC provided any financial support for mentoring and training, it provided approximately $10,000 for certain training materials that a member of the Firefighter Society procured.   NEBRC also reimbursed an individual from the Firefighter Society who had personally spent approximately $5,000 to cover the costs of certain mailings -- but NEBRC did so only after the individual from the Firefighter Society repeatedly requested reimbursement and threatened to go to the press to report NEBRC's failure to reimburse him.   Finally, although NEBRC had promised to provide physical conditioning training, NEBRC neither itself provided nor otherwise funded any physical conditioning training.   When an individual from the Firefighter Society requested funds to rent space in which to conduct physical conditioning, Seabrook Associate # 2 told him there were no funds left to cover the costs.

73.  NEBRC disbursed the funds it received in connection with the Fire Diversity/Recruitment Initiative to, among others, Seabrook Associate # 1, who served as Executive Director in connection with the Initiative; Seabrook Sister # 1, who served as a "consultant" in connection with the Initiative and was paid $10,000 to write a report that was six pages in length (minus the table of contents and the appendices), written in large font, and in large part double-spaced; and Seabrook's Nephew, who served as

a "recruiter."

74.   In or about the summer of 2008, when the media
asked the College for information about what NEBRC had done in
connection with the Fire Diversity/Recruitment Initiative,
Seabrook Associate # 2 made a number of material
misrepresentations concerning the work that NEBRC had done.  For
example, in an email dated June 30, 2008, Seabrook Associate # 2
told a representative of the College that NEBRC had worked "very
closely with the [Firefighter Society] and combined mentoring
sessions and testing prep for the written exam for several weeks
held every Tuesday."  Seabrook Associate # 2 further stated that
"mentorship will continue and I repeat, will continue through the
physical portion of the test to the time the candidate is called
up from the civil service list and hired as a probationary
firefighter."  In truth and in fact, however, NEBRC did not serve
any meaningful role in the prep sessions led by the Firefighter
Society, nor did NEBRC provide mentorship through the "physical
portion of the test."

### Statutory Allegation

75.   From in or about 2006 up to and including in or
about 2008, in the Southern District of New York and elsewhere,
LARRY SEABROOK, the defendant, together with others known and
unknown, unlawfully, willfully, and knowingly did combine,
conspire, confederate and agree together and with each other to

commit offenses under Chapter 63, Title 18, United States Code, to wit, mail fraud and wire fraud, in violation of Title 18, United States Code, Sections 1341 and 1343.

### Objects of the Conspiracy

76.  It was a part and the objects of the conspiracy that LARRY SEABROOK, the defendant, together with others known and unknown, having devised and intending to devise a scheme and artifice to defraud the City in connection with the Council's Fire Diversity/Recruitment Initiative, and for obtaining money by means of false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice and attempting to do so, would and did (1) transmit and cause to be transmitted by means of wire and radio communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit, interstate telephone calls and interstate wire transfers of funds, in violation of Title 18, United States Code, Section 1343, and (2) cause matters and things to be delivered by mail and private interstate carrier according to the directions thereon, to wit, correspondence and promotional flyers, in violation of Title 18, United States Code, Section 1341.

(Title 18, United States Code, Section 1349.)

## COUNT NINE

(Mail Fraud in Connection with the Council's FDNY Fire
Diversity/Recruitment Initiative)

The Grand Jury further charges:

77. The allegations contained in paragraphs one through 17, paragraphs 26 through 48, and paragraphs 56 through 74 of this Indictment are repeated and realleged as though fully set forth herein.

78. From in or about 2006 up to and including in or about 2008, in the Southern District of New York and elsewhere, LARRY SEABROOK, the defendant, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did, for the purpose of executing such scheme and artifice and attempting to do so, cause mail matter to be sent and delivered by the United States Postal Service, and to deposit and to cause to be deposited matters and things to be sent and delivered by private and commercial interstate carriers, and to take and to receive therefrom, matters and things, and knowingly to cause such matters and things to be delivered by mail and such carriers according to the direction thereon, and at the place at which it was directed to be delivered by the person to whom it was addressed, such matters and things, to wit, SEABROOK engaged in a scheme to defraud the City in connection with the Council's Fire Diversity/Recruitment

47

Initiative, and in furtherance of that scheme, he caused to be mailed correspondence and promotional flyers.

(Title 18, United States Code, Sections 1341 and 2.)

## COUNT TEN

(Wire Fraud in Connection with the Council's FDNY Fire Diversity/Recruitment Initiative)

The Grand Jury further charges:

79. The allegations contained in paragraphs one through 17, paragraphs 26 through 48, and paragraphs 56 through 74 of this Indictment are repeated and realleged as though fully set forth herein.

80. From in or about 2006 up to and including in or about 2008, in the Southern District of New York and elsewhere, LARRY SEABROOK, the defendant, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money by means of false and fraudulent pretenses, representations and promises, unlawfully, willfully, and knowingly, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, SEABROOK engaged in a scheme to defraud the City in connection with the Council's Fire Diversity/Recruitment Initiative, and in furtherance of that scheme, he transmitted and caused to be transmitted interstate telephone calls and interstate wire transfers of funds.

48

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT ELEVEN

(Conspiracy to Defraud a Non-Profit Organization in Connection
With a Job Placement Program Funded by the Council)

The Grand Jury further charges:

81.  The allegations contained in paragraphs one through
17, paragraphs 26 through 48, and paragraphs 56 through 74 of
this Indictment are repeated and realleged as though fully set
forth herein.

## Overview of the Fraudulent Scheme

82.  In or about 2007, the Council allocated millions of
dollars in connection with its Jobs To Build On Program ("JTBO"),
a job training and employment initiative spearheaded by, among
others, LARRY SEABROOK, the defendant.  The Council allocated
these JTBO funds, in the first instance, to a certain university
in the City ("University").  The University then entered into a
contract with a certain workers' education and training
organization ("Workers' Organization") to administer the JTBO
funds.

83.  After entering into a contract with the University, the
Workers' Organization sought to identify community-based
organizations with which it could partner to more effectively
provide employment and training services throughout the City in
connection with the JTBO initiative.  In or about the summer of

2007, after a representative of the Workers' Organization
contacted the Council and solicited recommendations about
community-based organizations with whom the Workers' Organization
could effectively partner, LARRY SEABROOK, the defendant,
recommended that the Workers' Organization partner with (a) NEBRC
and (b) the BAACC, an organization that SEABROOK helped create
following City Agency # 1's audit of NEBRC.  The Workers'
Organization ultimately entered into a $350,000 contract with
NEBRC and a $195,000 contract with BAACC.

84.   In recommending that the Workers' Organization contract
with NEBRC and BAACC, LARRY SEABROOK, the defendant, falsely
represented that NEBRC and BAACC were entities with whom the
Workers' Organization could contract to effectively provide
employment and training services.  Furthermore, SEABROOK failed
to disclose material facts including: (a) City Agency # 1 had
audited NEBRC and identified serious problems with NEBRC's
financial accounting as well as with its performance under the
contract; (b) NEBRC had been under investigation by DOI; and (c)
the funds allocated to NEBRC and BAACC pursuant to the contract
with the Workers' Organization would benefit individuals close to
SEABROOK, including, among others, his girlfriend and his nephew.

85.   Between 2007 and 2008, in the course of administering
its contracts with NEBRC and BAACC, the Workers' Organization
identified serious problems with the financial management of

50

these groups, discovered that these groups were falling radically
short of the performance goals set forth in the contracts, and,
in the case of BAACC, the Workers' Organization even suspended
and ultimately terminated the contract.

## Events Leading to the Creation of the BAACC

86.  In or about December 2006 or January 2007, several
months after LARRY SEABROOK, the defendant, had learned that City
Agency # 1 had discovered serious problems with the management
and operation of NEBRC, SEABROOK approached the executive of a
non-profit African-American chamber of commerce ("African-
American Chamber of Commerce Executive") in an attempt to direct,
to her group, discretionary funds that SEABROOK previously had
attempted to allocate to NEBRC.  SEABROOK asked the African-
American Chamber of Commerce Executive, in sum and substance,
whether she and her organization would be willing to partner with
him to implement approximately $500,000 of programs relating to
"streetscape" improvements and the promotion of business
opportunities for people of color.  SEABROOK told the African-
American Chamber of Commerce Executive that the funds would be
overseen by City Agency # 1.  The African-American Chamber of
Commerce Executive conferred with the board of her organization
and agreed to enter into a partnership with SEABROOK to implement
these programs.

87.  On or about January 11, 2007, LARRY SEABROOK, the

defendant, sent a memorandum to the Finance Division of the Council requesting, among other things, that $355,000 of funding allocated to NEBRC for the 2006-2007 fiscal year (for "streetscape" improvements, among other things) be transferred instead to the organization led by the African-American Chamber of Commerce Executive.

88.   Subsequently, LARRY SEABROOK, the defendant, insisted that the African-American Chamber of Commerce Executive hire and work with Seabrook Associate # 9.

89.   After the African-American Chamber of Commerce Executive questioned certain statements that she believed Seabrook Associate # 9 had made on behalf of her organization and without her authorization, on or about January 29, 2007, Seabrook Associate # 9 sent the African-American Chamber of Commerce Executive an email in which he stated the following, on behalf of himself and SEABROOK: "...you need to be clear about the nature of our 'partnership.' [Your organization] is to be a fiscal conduit for funds for two projects which we will be undertaking in the Bronx."  Soon after, and before the City actually transferred any funds to her organization, the African-American Chamber of Commerce Executive informed SEABROOK and City Agency # 1 that her organization was no longer willing to partner with SEABROOK.

90.   Several weeks later, on or about March 20, 2007, the

BAACC was created, with Seabrook's Wife as a founding member of
the Board of Directors.  In or about May 2007, Seabrook Associate
# 9 filed papers with the New York State Department of State
incorporating BAACC.

### The Attempted Funding of the BAACC

91.  In or about the summer of 2007, prior to the adoption
of the budget for the 2008 fiscal year, LARRY SEABROOK, the
defendant, requested that approximately $925,458 of discretionary
funds be allocated to BAACC, including the $355,000 that SEABROOK
previously had asked the Council to allocate to the organization
led by the African-American Chamber of Commerce Executive.  The
Council passed a budget approving these expenditures for the
2007-2008 fiscal year.

92.  Of the discretionary funds that LARRY SEABROOK, the
defendant, caused to be allocated to the BAACC in the summer of
2007, approximately $62,244 were, according to the budget that
the Council approved, due to be administered pursuant to
contracts with City Agency # 1, the same agency that previously
had identified serious problems with NEBRC.  Only weeks after the
budget passed, in or about July 2007, SEABROOK requested that
these approximately $62,244 in discretionary funds be provided to
BAACC instead by a different City agency.  To facilitate the
transfer of funds that SEABROOK requested, the Finance Division
of the Council transferred the approximately $62,244 in funds

from City Agency # 1 to a different City agency through the use
of a "holding code."

93.    In or about the spring of 2008, after the Council's use
of "holding codes" was discovered, the City froze allocations of
funding to many non-profit organizations that were designated to
receive discretionary funding, including the entirety of the
$925,458 that LARRY SEABROOK, the defendant, attempted to direct
to the BAACC.

### Background on the Jobs To Build On Program

94.    In or about 2007, the Workers' Organization -- a non-
profit organization dedicated to providing employment, training
and educational services to workers entered into a contract with
the University to receive millions of dollars of funds allocated
to that University by the Council in connection with the JTBO
initiative spearheaded by, among others, LARRY SEABROOK, the
defendant.   Pursuant to that contract, the Workers' Organization
was obligated to use the funds for, among other things, job
training and placement.

95.    After receiving the contract, the Workers' Organization
sought to identify community-based organizations with which it
could partner to more effectively provide employment and training
services throughout the City.   In connection with this effort, a
representative of the Workers' Organization contacted the Council
and solicited recommendations about community-based organizations

54

with whom the Workers' Organization could effectively partner.

**Means and Methods of the Conspiracy**

96.   In or about the summer of 2007, LARRY SEABROOK, the defendant, provided the Workers' Organization with a list of 11 community-based organizations that the Council recommended the Workers' Organization enter into contract with to effectively provide employment and training services.  Of the 11 organizations on the list SEABROOK provided, one was NEBRC and another was BAACC.

97.   In recommending that the Workers' Organization contract with NEBRC and BAACC to provide services, LARRY SEABROOK, the defendant, failed to disclose to the Workers' Organization, as he well knew, the following material facts, among others:

a.   City Agency # 1 had audited NEBRC and identified serious problems with NEBRC's financial accounting as well as with its performance under the contract;

b.   NEBRC had been under investigation by DOI;

c.   SEABROOK and unindicted co-conspirators associated with NEBRC had engaged in a years-long scheme to commit fraud in connection with discretionary funding (as described in Counts Five through Seven);

d.   SEABROOK and unindicted co-conspirators associated with NEBRC had committed fraud in connection with the Fire Diversity/Recruitment Initiative (as described in Counts Eight

through Ten);

     e.  The funds allocated to NEBRC and BAACC pursuant to the contract with the Workers' Organization would benefit individuals close to SEABROOK, including, among others, his girlfriend and his nephew; and

     f.  SEABROOK and Seabrook Associate # 9 had approached another non-profit organization, namely the one led by African-American Chamber of Commerce Executive, and attempted to use her organization as a fiscal conduit.

    98.  Moreover, in recommending that the Workers' Organization contract with NEBRC and BAACC to provide services, LARRY SEABROOK, the defendant, falsely represented that NEBRC and BAACC were entities with whom the Workers' Organization could contract to effectively provide employment and training services.

### The Contract with NEBRC

    99.  Before entering into contracts with any of the organizations on the list provided by LARRY SEABROOK, the defendant, the Workers' Organization required interested organizations to submit a proposal detailing the work the organization could perform.  On or about October 16, 2007, NEBRC submitted a proposal to the Workers' Organization.  In its proposal, NEBRC touted itself as being "a community catalyst for the educational and employment advance of residents of its neighborhood."  As an example of its recent work, NEBRC pointed

56

to its "successful effort to recruit more minorities into the FDNY" and falsely stated that NEBRC -- "in collaboration with" the firefighter society -- "held weekly tutorial sessions for 4 months in preparation for the FDNY exam." NEBRC also purported to have effectively recruited "354" students in connection with the Fire Diversity/Recruitment Initiative.

100. Subsequently, in or about December 2007, the Workers' Organization entered into a job placement services contract with NEBRC in the amount of $350,000 for the contract period of July 2007 up to and including June 2008. Pursuant to the contract, NEBRC agreed to make contact with 1,000 potential job clients, assess 500 clients for eligibility and suitability, register 365 of these clients, and provide employment support services to 285 of them.

101. During the course of its contract with NEBRC, the Workers' Organization identified serious problems with NEBRC's financial management and its performance under the contract with the Workers' Organization. These problems included the following:

a.   On a number of occasions when a program coordinator for the Workers' Organization made an unannounced visit to NEBRC's office, the office was closed.

b.   NEBRC provided inadequate or false documentation in support of the services it was allegedly providing and the

expenses it was incurring pursuant to its contract with the
Workers' Organization, including doctored checks and fraudulent
intake forms.

     c.    NEBRC distributed outreach and recruitment flyers
that only advertised occupational training for commercial truck
driving when in fact NEBRC was obligated to provide information
about other occupational training programs, as well.

     d.    NEBRC mailed out misleading correspondence that,
among other things, falsely guaranteed job placement and inflated
the amount of funds available in connection with the JTBO
Program.

     e.    NEBRC was not adequately assessing the educational
needs of program participants.

     f.    NEBRC fell short of its contractual goals, among
other things, to make contacts with prospective participants,
assess them, and register them.

    102. On or about June 30, 2008, the Workers' Organization
sent a letter to NEBRC stating that NEBRC's contract would not be
renewed.

    103. Of the funds NEBRC received from the Workers'
Organization for the work it purported to have performed,
approximately $27,500 was paid to Seabrook Associate # 1, and
$5,700 was paid to Seabrook's Nephew.

## The Contract with BAACC

104. In or about the fall of 2007, BAACC, which was then led by Seabrook Associate # 9, submitted a proposal to the Workers' Organization explaining that while it was a new organization, it was prepared to draw upon the experiences of its founders, board members, and staff to provide "creative solutions" to the old problem of unemployment in the Bronx.

105. In or about February 2008, the Workers' Organization entered into a job placement services contract with BAACC in the amount of $195,000 for the contract period of February 2008 up to and including November 2008.  Pursuant to the contract, BAACC agreed, among other things, to make contact with 500 potential job services clients, assess 300 clients for eligibility and services, register 150 of them into services, and provide employment support services to 150.  In addition, BAACC agreed, among other things, to provide 40 registered clients with direct job placement services, 24 of whom would be employed 90 days after initial employment.

106. Almost from the outset of the contract, the Workers' Organization had serious concerns about BAACC's performance, administration, and financial management.  Partly because of those concerns and partly because the City froze the approximately $925,458 in discretionary funds that LARRY SEABROOK, the defendant, had otherwise attempted to allocate to

59

BAACC, the Workers' Organization, in or about the spring of 2008, decided to suspend its contract with BAACC and refused to continue funding BAACC.  Subsequently, representatives of the Workers' Organization had a number of meetings and conversations with representatives of BAACC, some of which meetings and conversations included SEABROOK.  At one such meeting, SEABROOK himself questioned why BAACC was not receiving payments.

### The Relationship Between the Workers' Organization and Others Closely Associated with Seabrook

107.   The Workers' Organization also had relationships with others closely associated with LARRY SEABROOK, the defendant. The Workers' Organization hired Seabrook Associate # 3 to serve as a liaison between the Workers' Organization and the City Council in connection with the JTBO initiative.  The Workers' Organization entered into contracts totaling approximately $156,200 with Seabrook Associate # 3 for work from in or about September 2007 through in or about June 2009.  Additionally, the Workers' Organization paid one of Seabrook's nephews approximately $41,000 for work in connection with a boiler training program at the boiler factory of the Bronx Boiler Executive.

### Statutory Allegation

108.   From in or about 2007 up to and including in or about 2008, in the Southern District of New York and elsewhere,

LARRY SEABROOK, the defendant, together with others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate and agree together and with each other to commit offenses under Chapter 63, Title 18, United States Code, to wit, mail fraud and wire fraud, in violation of Title 18, United States Code, Sections 1341 and 1343.

## Objects of the Conspiracy

109.   It was a part and the objects of the conspiracy that LARRY SEABROOK, the defendant, together with others known and unknown, having devised and intending to devise a scheme and artifice to defraud the Workers' Organization in connection with the Jobs to Build On Program funded by the Council, and for obtaining money by means of false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice and attempting to do so, would and did (1) transmit and cause to be transmitted by means of wire and radio communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit, interstate wire transfers of funds, in violation of Title 18, United States Code, Section 1343, and (2) cause matters and things to be delivered by mail and private interstate carrier according to the directions thereon, to wit, correspondence and promotional flyers, in violation of Title 18, United States Code, Section 1341.

(Title 18, United States Code, Section 1349.)

61

## COUNT TWELVE

(Mail Fraud in Connection with a Job Placement Program Funded by
the Council)

The Grand Jury further charges:

110.   The allegations contained in paragraphs one through
17, paragraphs 26 through 48, paragraphs 56 through 74, and
paragraphs 82 through 106 of this Indictment are repeated and
realleged as though fully set forth herein.

111.   From in or about 2007 up to and including in or
about 2008, in the Southern District of New York and elsewhere,
LARRY SEABROOK, the defendant, having devised and intending to
devise a scheme and artifice to defraud, and for obtaining money
and property by means of false and fraudulent pretenses,
representations, and promises, would and did, for the purpose of
executing such scheme and artifice and attempting to do so, cause
mail matter to be sent and delivered by the United States Postal
Service, and to deposit and to cause to be deposited matters and
things to be sent and delivered by private and commercial
interstate carriers, and to take and to receive therefrom,
matters and things, and knowingly to cause such matters and
things to be delivered by mail and such carriers according to the
direction thereon, and at the place at which it was directed to
be delivered by the person to whom it was addressed, such matters
and things, to wit, SEABROOK engaged in a scheme to defraud the
Workers' Organization in connection with the Jobs to Build On

Program funded by the Council, and in furtherance of that scheme, he caused to be mailed correspondence and promotional flyers.

(Title 18, United States Code, Sections 1341 and 2.)

## COUNT THIRTEEN

(Wire Fraud in Connection with a Job Placement Program Funded by
the Council)

The Grand Jury further charges:

112.   The allegations contained in paragraphs one through
17, paragraphs 26 through 48, paragraphs 56 through 74, and
paragraphs 82 through 106 of this Indictment are repeated and
realleged as though fully set forth herein.

113.   From in or about 2007 up to and including in or
about 2008, in the Southern District of New York and elsewhere,
LARRY SEABROOK, the defendant, having devised and intending to
devise a scheme and artifice to defraud, and for obtaining money
by means of false and fraudulent pretenses, representations and
promises, unlawfully, willfully, and knowingly, did transmit and
cause to be transmitted by means of wire communication in
interstate and foreign commerce, writings, signs, signals,
pictures, and sounds for the purpose of executing such scheme and
artifice, to wit, SEABROOK engaged in a scheme to defraud the
Workers' Organization in connection with the Jobs to Build On
Program funded by the Council, and in furtherance of that scheme,
he transmitted and caused to be transmitted interstate wire
transfers of funds.

(Title 18, United States Code, Sections 1343 and 2.)

64

## FORFEITURE ALLEGATION

114.   As the result of committing the mail and wire fraud, conspiracy, and unlawful gratuity offenses in violation of Title 18, United States Code, Sections 666, 1341, 1343, 1349, 1951, and 1952 alleged in Counts One through Thirteen of this Indictment, LARRY SEABROOK, the defendant, shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(c) and 28 U.S.C. § 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offense.

## Substitute Asset Provision

115.   If any of the above-described forfeitable property, as a result of any act or omission of the defendant:  (a) cannot be located upon the exercise of due diligence;  (b) has been transferred or sold to, or deposited with, a third person;  (c) has been placed beyond the jurisdiction of the Court;  (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be subdivided without difficulty, it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property.

(Title 18, United States Code, Section 981 and
Title 28, United States Code, Section 2461.)


_____
GRAND JURY FOREPERSON

_____
BREET BHARARA
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

## UNITED STATES OF AMERICA

- v. -

## LARRY SEABROOK

**Defendant.**

## INDICTMENT

10 Cr.

(Title 18, United States Code, Sections 666, 1341, 1343,
1349, 1951(a), 1952, 1956)

PREET BHARARA
United States Attorney.

_____
                    Foreperson.